Filed 2/6/23  P. v. West CA1/2
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JASON WEST,<br><br>        Defendant and Appellant. | A157163<br><br>(Alameda County<br>Super. Ct. No. 152985C) |

This matter is before us following the Supreme Court's transfer with directions to vacate our prior decision (*People v. West* (Feb. 10, 2020, A157163) [nonpub. opn.] (*West I*)), and reconsider the cause in light of *People v. Lewis* (2021) 11 Cal.5th 952 (*Lewis*) and *People v. Strong* (2022) 13 Cal.5th 698 (*Strong*).  After reconsidering the cause, we conclude that the court erred by summarily denying West's petition for resentencing (former Pen. Code, § 1170.95, now § 1172.6)[1] without appointing him counsel.  We reverse the trial court's order, and remand the matter to the trial court with directions to appoint counsel, receive briefing, and determine if West has made a prima facie case for relief.

---

[1] On June 30, 2022, after West's petition for review was granted, Penal Code section 1170.95 was renumbered section 1172.6 without substantive change. (Stats. 2022, ch. 58, § 10.)  All further undesignated statutory references are to the Penal Code.

# BACKGROUND

In 2007, West was convicted, together with Ishmael Johnson and Terrell Watson, of the first-degree murder of Lamar Whitehead (§ 187), committed in the course of an attempted carjacking (§ 190.2, subd. (a)(17)(L)), and, together with Watson, of the attempted murder of Keith Griffin (§§ 664, 187).[2]  In 2010, this court affirmed his conviction.  (See *People v. Johnson* (June 14, 2010, A121366) [nonpub. opn.].)  Our opinion summarized the facts of the offense, as shown by the evidence at trial, as follows:

"Keith Griffin testified that he and his long-time friend, Lamar Whitehead, the murder victim, were interested in modifying and accessorizing their cars.  Griffin equipped a Chevrolet Monte Carlo with elaborate 20–inch chrome wheel rims that cost about $1,400.  These rims could not simply be popped off with a crowbar; they could only be removed after jacking up the car and unscrewing a number of lug nuts.  He estimated that it would take 'about 15 minutes' to remove the rims from his car, 'plus you got to get through the lock nuts.'  Therefore, he testified, if someone was going to steal his rims, they would have to take his whole car to do it.

"Griffin worked in San Leandro and Whitehead, 21 years old at the time of his death, worked a graveyard shift in Oakland starting at 11:00 p.m.  Griffin was often asked by Whitehead for a ride to work, and drove his car to Whitehead's residence at least 100 times after installing the rims.  At 10:45 p.m. on January 27, 2005, Griffin drove his Monte Carlo to Whitehead's residence again, located in an apartment complex at 3901 Webster Street in

---

[2] The jury also found true various firearm enhancements, including that West personally and intentionally discharged a firearm causing death to Lamar Whitehead, and great bodily injury to Keith Griffin (§ 12022.7, subd. (a); § 12022.53, subd. (d)).

Oakland, to give Griffin a ride to work again, arriving there at 10:51 p.m. The apartment complex consisted of three apartment buildings, with a parking lot serving all three, for which there was only one entrance/exit.

"As Griffin pulled into the complex parking lot, he saw a group of about five men and women standing on the sidewalk, and a group of about three young men standing across the street near a battered, brown Buick Skylark. He stopped at the far end of the parking lot and called Whitehead, who came out of his apartment and entered the car. As Griffin started to back up, he heard a noise which, according to his testimony, sounded 'like somebody balled up their fist and . . . gave like two knocks on the side of the car, like "Stop." ' Griffin put on his brakes. He saw a man 'walking around the back of the car. They came up the driver's side, and they walked all the way up. . . . I rolled the window down, and I was like "Ah, my bad." ' The man walked toward the front of the car, turned around, and asked, 'What did you say?' He then opened the driver's side door, reached into his waistband and said, 'Nigger, check this out.' Griffin testified that he assumed the man, who looked like defendant Watson, was reaching for a gun.

"Griffin pulled the car door shut and 'just hit the gas.' As he backed into the gate of the parking lot entrance, he heard a gunshot, which did not hit any of his car's windows. The man was standing in the middle of the parking lot pointing a black revolver, which Griffin thought was probably .38 caliber, straight at Griffin's head from 20 to 25 feet away. Griffin testified, 'I threw the car in drive, and I punched the gas, and I tried to run him over, and he jumped over to the side in between some parked cars and I ran into a car.' As Griffin shifted in reverse, he saw a flash, his driver's side window shattered, and he felt something land on his arm.

3

"Griffin 'hit the gas to go backwards.' He steered through the parking lot gate and turned onto the street, where the crowd had grown bigger. A man standing next to a rock quickly pointed a gun at Griffin's vehicle and fired, shattering the passenger-side window, and, Griffin thought, hitting Whitehead, who slumped over and made a gurgling sound, as if he was choking. Griffin could not describe this shooter, other than to say he was calm. In his first two statements to police, Griffin thought it was the same person who shot at him in the parking lot, but at trial he testified that he thought there were two shooters. Griffin ducked down, shifted gears, and 'punched the gas.' He ran into the back of a parked truck, but pushed it out of the way, and drove off. He heard more shots, but did not see where they came from.

"As Griffin drove home, he called 911 and asked for an ambulance, which arrived within a minute of his arrival at his house. Griffin was eventually taken to the hospital. A gunshot had entered his body under his armpit and come out at the top of his arm.

"Whitehead was killed. The parties stipulated that he died from a bullet wound to the chest. It passed through his left arm, then penetrated his left lung, pericardial sac, heart, liver, and right lung, exiting into his right chest wall. Two bullet fragments were taken from Whitehead's body, one was found on his jacket, and another was found on the back floorboard of Griffin's car." (*People v. Johnson*, *supra*, A121366.)

Our opinion also described the testimony of E.L., a witness who was a minor at the time of the shooting:

"According to E.L.'s trial testimony, Watson opened the passenger side door of his car, reached across E.L., and pulled out a black gun. He also put on a 'hoodie' and a leather jacket. Watson and Johnson walked across the

4

street together, and Watson entered the parking lot while Johnson stood by the parking lot gate. West remained behind Watson's vehicle.

"Within two to three minutes, E.L. saw a 'big light flash' and heard gunshots coming from the parking lot. She testified, 'I heard a big crash . . . like, it was a big car accident, and then all of a sudden I seen a car spinning, and he like hit all the cars trying to come out the parking lot. He hit about like four cars coming out of the parking lot. And when he was like by the fence where [Johnson] was at, that's when [Johnson] hollered, "Shoot. Shoot." The very next thing that happened was after he said, "Shoot. Shoot," all the other guys just—I turned around. All the other guys just start pulling out guns and just started shooting every which way.' West stood in the middle of the street and fired a silver gun twice at the car. About three others also fired guns." (*People v. Johnson*, *supra*, A121366.)

And we described the testimony of M.P., also a minor at the time of the shooting, regarding her interview with the police:

"M.P. renounced the incriminating information about defendants she told to police in her interview, testifying that none of what she said was true. This included that she saw 'the end' of Whitehead getting shot, opened her door and saw Whitehead's friend's car crashing, looked outside after the shooting and saw Watson running away with a gun in his hand, saw West fire two shots with a gun from across the street at a car driving away with Whitehead inside, saw that West's gun 'broke,' saw Watson shoot his gun when Johnson yelled, 'Shoot, shoot,' saw the car crash into another car on Webster Street, saw 'heck of boys' running when the car crashed, and saw, that, as the car went towards 38th Street, Johnson, West and Watson together, ran in the opposite direction, towards 40th Street, with Watson and West holding guns in their hands. M.P. said she lied to the police, did not

5

know why she lied, and was nervous, scared, and under pressure at the time." (*People v. Johnson*, *supra*, A121366.)

West was sentenced to seven years for the attempted murder, a consecutive term of life without parole for the murder, and two consecutive terms of 25 years to life for the firearm enhancements under section 12022.53, subdivision (d).[3]

***Senate Bill 1437 and West's Petition for Resentencing***

Senate Bill No. 1437, which took effect on January 1, 2019 (Stats. 2018, ch. 1015), limits first degree felony-murder liability to three categories of defendants: (a) "the actual killer"; (b) a defendant who "was not the actual killer, but, with the intent to kill," aided and abetted the actual killer; or (3) a defendant who "was a major participant in the underlying felony and acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 3; § 189, subd. (e).) Senate Bill No. 1437 also created a procedure—now set out in section 1172.6—whereby a defendant convicted of felony-murder may petition the sentencing court to have his or her conviction vacated if the following three conditions are satisfied:

"(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine.

"(2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder.

---

[3] The remaining firearm enhancements were imposed and stayed.

"(3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a), see Stats. 2018, ch. 1015, § 4.)

Former section 1170.95, subdivision (c), in effect at the time of West's petition, also provided: "The court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section. If the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner. The prosecutor shall file and serve a response within 60 days of service of the petition and the petitioner may file and serve a reply within 30 days after the prosecutor response is served. These deadlines shall be extended for good cause. If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause."

On March 20, 2019, acting in propria persona, West filed a handwritten petition for resentencing under Senate Bill No. 1437. The petition asserted a variety of arguments, including that certain statutes and jury instructions were unconstitutionally vague, and made a few brief references to Senate Bill No. 1437. The petition also attached several exhibits: the abstract of judgment (exhibit A); a reporter's transcript of the return of the jury's verdict and sentencing hearing (exhibit B); copies of the jury instructions on murder, felony murder, and aiding and abetting (exhibit C); the jury's verdict (exhibit D); a Senate Committee Analysis of Senate Bill 261 relating to youth offender parole (exhibit E); the jury instructions on the carjacking special circumstance (exhibit F); and the jury instructions on first degree murder (exhibit G).

On March 26, without appointing counsel and before receiving a response from the government, the trial court denied the petition in a 15-page written opinion. After recounting the procedural background and the

7

facts of the offense as drawn from our opinion on appeal, the opinion denying the petition concluded as follows:

"The Petition is denied because relief under section 1170.95 is unavailable to Petitioner. As provided in Petitioner's direct appeal, there was substantial evidence that Petitioner intended to engage in the carjacking of Griffin's vehicle. As provided in that opinion, there was a significant amount of substantial evidence, largely contained in E.L.'s and/or M.P.'s testimony, that the defendants planned to take control of Griffin's car and steal the rims. Griffin testified that he had driven his rim-accessorized Monte Carlo to the apartment complex at least 100 times, and often gave Whitehead a ride to his job, which started at 11:00 p.m. Watson and Petitioner frequented the apartment complex, and Johnson lived there. Johnson was heard talking to Watson and Petitioner about waiting for someone to bring him some rims on the day of the shooting. The three were seen leaving and returning to the area of the apartment complex together, where they waited outside for at least one-half hour. When Griffin drove up in his Monte Carlo, Johnson was heard to say, 'That's him right there. That's him. There he go.' Watson was seen immediately retrieving a gun from his car, putting on a hoodie, and walking across the street to the complex's parking lot with Johnson, while Petitioner stayed behind Watson's car. Subsequent events indicate Watson and Petitioner were each armed with a loaded weapon. Watson then followed Griffin's car into the parking lot. Petitioner, already armed, remained across the street from the apartment complex, and Johnson positioned himself by the parking lot gate, somewhere between Watson and Petitioner. After Whitehead got in the car, Watson approached, manufactured a confrontation with Griffin, opened the driver's side door, and showed Griffin his weapon. Griffin's testimony indicated that when he resisted Watson's intimidation,

Watson did not hesitate to shoot at him—*before* Griffin tried to run him over, indicating the willingness to use weapons fire to carjack Griffin's car. When Griffin continued his efforts to escape, Johnson promptly yelled to shoot and Petitioner promptly did so, stopping only because his gun broke. It was only after Griffin escaped that they ran away.

"As the Court of Appeal pointed out, the jury could reasonably infer from defendants' positioning (with Petitioner outside the complex and Johnson by the parking lot gate) and Watson's opening of the driver's side door, that they planned all along for Watson to jump into the driver's seat after intimidating or forcing Griffin and Whitehead to give up the car, pick up Johnson and Petitioner, and drive away. Additionally, substantial evidence presented at trial indicated that Watson and Petitioner fired multiple times a[t] the car within moments of each other, that either could have been the proximate cause of the injuries, and that it was not possible to determine who shot Griffin or Whitehead. Furthermore, there was no evidence presented at trial that Petitioner had any 'sudden quarrel' with Griffin or Whitehead, that they said or did anything sufficient to provoke an ordinarily reasonable person to deadly violence, or that Petitioner acted under the heat of passion. Similarly, there was not substantial evidence that Petitioner believed himself or anyone else to be in imminent danger of death or great bodily harm when he shot at the Monte Carlo. There was no evidence that Griffin attempted to do any harm to Petitioner when he drove out of the parking lot. There was no substantial evidence that Petitioner acted in response to anything other than Johnson's shout to shoot.

"Accordingly, Petitioner was either the actual killer or, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murders in the first degree,

9

or was a major participant in the underlying felony and acted with reckless indifference to human life, given the true finding on the special circumstance allegation. (§§ 189, subd. (e); 190.2, subds. (c), (d).) Additionally, Petitioner was not convicted of murder under the natural and probable consequences doctrine. Rather, Petitioner was convicted on a valid theory of murder which survives the changes to sections 188 and 189 made by [Senate Bill No.] 1437. (§ 1170.95, subd. (a)(3).)"

West appealed, and in *West I*, we concluded that he had not demonstrated any error in the trial court's summary denial of his petition because in finding the special circumstance true, the jury necessarily concluded either that West had the intent to kill, or that all of the following were true: "1. The defendant's participation in the crime began before or during the killing; [¶] 2. The defendant was a major participant in the crime; [¶] AND 3. When the defendant participated in the crime, he acted with reckless indifference to human life." (See CALCRIM No. 703; *West I, supra,* A157163, p. 12.) We held that the trial court did not err in relying on the summary of the facts of the offense contained in our opinion on direct appeal. (*West I, supra,* A157163, p. 13.) And we concluded that any error in failing to appoint counsel to represent West before ruling on his petition was harmless beyond a reasonable doubt, because, given the jury's special circumstance finding, West had not explained how the assistance of counsel in preparing a reply brief could have produced a different result. (*West I, supra,* A157163, p. 14.)

West petitioned for review, and on April 15, 2020, our Supreme Court granted the petition and deferred the matter pending disposition of *Lewis, supra,* 11 Cal.5th 952. On February 9, 2022, the Court issued an order expanding its review in this matter to include the issue then pending in

*Strong*, *supra*, 13 Cal.5th 698. Following its decisions in *Lewis* and *Strong*, on November 16, 2022, the Court transferred the matter back to this court with directions to vacate our decision and reconsider the cause in light of *Lewis* and *Strong*.

## DISCUSSION

### *Lewis*

In *Lewis*, our Supreme Court held that once a petitioner files a petition that complies with the three requirements of section 1172.6, subdivision (a) and requests the appointment of counsel, the superior court must appoint counsel and permit the parties to submit briefing before deciding whether the petitioner has made a prima facie case for relief as required by subdivision (c). (See *Lewis*, *supra*, 11 Cal.5th at p. 963 ["petitioners who file a complying petition requesting counsel are to receive counsel upon the filing of a compliant petition"]; *id*. at pp. 962–966.)

And, with respect to the question of whether the trial court can look to the record of conviction, including appellate opinions, in determining whether the petition has made that prima facie case, *Lewis* said this:

"While the trial court may look at the record of conviction after the appointment of counsel to determine whether a petitioner has made a prima facie case for section [1172.6] relief, the prima facie inquiry under subdivision (c) is limited. Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' ([*People v.*] *Drayton* [(2020)] 47 Cal.App.5th [965,] 978, quoting Cal. Rules of Court, rule 4.551(c)(1)).) '[A] court should not reject the petitioner's factual allegations on credibility

11

grounds without first conducting an evidentiary hearing.' (*Drayton*, at p. 978, fn. omitted, citing *In re Serrano* (1995) 10 Cal.4th 447, 456.) 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' (*Drayton*, at p. 979, quoting *Serrano*, at p. 456.)

"Appellate opinions . . . are generally considered to be part of the record of conviction. (See *People v. Woodell* (1998) 17 Cal.4th 448, 454–455.) However, as we cautioned in *Woodell*, the probative value of an appellate opinion is case-specific, and 'it is certainly correct that an appellate opinion might not supply all answers.' (*Id*. at p. 457.) In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' (*Drayton*, *supra*, 47 Cal.App.5th at p. 980.) As the People emphasize, the 'prima facie bar was intentionally and correctly set very low.'

"In sum, the parties can, and should, use the record of conviction to aid the trial court in reliably assessing whether a petitioner has made a prima facie case for relief under section [1172.6], subdivision (c)." (*Lewis*, *supra*, 11 Cal.5th at pp. 971–972.)

Following *Lewis*, the Legislature amended section 1172.6 to codify a portion of that decision in subdivision (b)(3), which now provides: "Upon receiving a petition in which the information required by this subdivision is set forth or a petition where any missing information can readily be ascertained by the court, if the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner." After providing the parties "an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If

12

the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause. If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so." (§ 1172.6, subd. (c).)

*Lewis* further held that a trial court's failure to appoint counsel to represent a petitioner when assessing whether he or she has made a prima facie showing of entitlement to relief is state law error only, reviewable for prejudice under *People v. Watson* (1956) 46 Cal.2d 818. (*Lewis, supra,* 11 Cal.5th at pp. 957, 973–974.) "More specifically, a petitioner 'whose petition is denied before an order to show cause issues has the burden of showing "it is reasonably probable that if [he or she] had been afforded assistance of counsel his [or her] petition would not have been summarily denied without an evidentiary hearing." ' " (*Lewis, supra,* 11 Cal.5th at p. 974, quoting *People v. Daniel* (2020) 57 Cal.App.5th 666, 676.)

### *Strong*

In *Strong,* our Supreme Court held that special circumstance findings that the defendant was a major participant in the underlying felony and acted with reckless indifference to human life "issued by a jury before [*People v.*] *Banks* [(2015) 61 Cal.4th 788 (*Banks*)] and [*People v.*] *Clark* [(2016) 63 Cal.4th 522 (*Clark*) (which significantly changed the prevailing understanding of major participation and reckless indifference)] do not preclude a defendant from making out a prima facie case for relief under [§ 1172.6]. This is true even if the trial evidence would have been sufficient to support the findings under *Banks* and *Clark*." (*Strong, supra,* 13 Cal.5th at p. 710; accord, *id.* at p. 721 [major participation and reckless indifference findings "will not defeat an otherwise valid prima facie case" unless those findings were made after *Banks* and *Clark* were decided].)

**Remand Is Required for the Trial Court to Evaluate West's Petition in Light of *Strong* and *Lewis***

Following the Supreme Court's transfer in this case, West filed a supplemental brief, arguing that under *Lewis*, the trial court erred in failing to appoint counsel and receive briefing before evaluating whether he had made a prima facie case for relief, and that the jury's special circumstance finding does not establish that he is ineligible for resentencing under *Strong*. The Attorney General filed a short supplemental brief, agreeing with West that the trial court erred in failing to appoint counsel and provide an opportunity for briefing before determining whether West has made a prima facie case for relief under section 1172.6, subdivision (c).

We agree with the parties that the trial court erred in failing to appoint counsel to represent West and provide an opportunity for briefing before ruling on West's section 1172.6 petition under *Lewis*. (See *Lewis*, *supra*, 11 Cal.5th at pp. 962–966.) And although our previous opinion found that error was harmless beyond a reasonable doubt because of the jury's special circumstance finding, that reasoning has been undermined by *Strong*. Because the jury made its special circumstance finding in 2007, before *Banks* and *Clark* were decided, that finding does not prevent West from making a prima facie case for relief under section 1172.6. (*Strong*, *supra*, 13 Cal.5th at p. 710.) Accordingly, we will vacate the order summarily denying the petition and remand for the trial court to appoint counsel, provide an opportunity for briefing, and proceed to determine whether West has made a prima facie case for relief under the current version of section 1172.6, as well as the Supreme Court's decisions in *Lewis* and *Strong*.

West also argues that the trial court erred in performing "factfinding involving weighing of the evidence" by analyzing the facts in our opinion on direct appeal. He relies on Senate Bill No. 775, effective January 1, 2022,

14

which amended section 1172.6, subdivision (d)(3) to provide that at the evidentiary hearing to determine whether the petitioner is entitled to relief, the court "may also consider the procedural history of the case recited in any prior appellate opinion," and cases holding that this precludes the trial court from considering a prior appellate opinion's statement of facts at the evidentiary stage of ruling on a section 1172.6 petition.  (See, e.g., *People v. Clements* (2022) 75 Cal.App.5th 276, 292 ["specificity" of the language "indicates the Legislature has decided trial judges should not rely on the factual summaries contained in prior appellate decisions when a section [1172.6] petition reaches the stage of a full-fledged evidentiary hearing"]; *People v. Cooper* (2022) 77 Cal.App.5th 393, 400, fn. 9 ["Senate Bill [No.] 775 prevents a trial court from relying on facts recited in an appellate opinion to rule on a petition under section [1172.6]"].)  The Attorney General contends that even after Senate Bill No. 775, under *Lewis*, "the parties can, and should, use the record of conviction to aid the trial court in reliably assessing whether petitioner has made a *prima facie case for relief* under [section 1172.6], subdivision (c)."  (*Lewis*, *supra*, 11 Cal.5th at p. 972, italics added.)  Because we will vacate the trial court's order and remand for a new evaluation of whether West's petition makes a prima facie case for relief, and because Senate Bill No. 775 was enacted after the trial court's original order, the trial court should consider to what extent it may rely on our opinion on direct appeal under the current state of the law.


## DISPOSITION

Our opinion in *West I* is vacated.  The order summarily denying West's petition for resentencing under section 1172.6 is reversed, and the matter is

15

remanded for the trial court to appoint counsel, provide an opportunity for briefing, and determine whether West has made a prima facie case for relief consistent with the current version of section 1172.6, as well as our Supreme Court's decisions in *Lewis* and *Strong*.

_____
Richman, J.

We concur:


_____
Stewart, P.J.


_____
Miller, J.

*People v. West* (A157163)